(C.D. 4382)

MITSUBISHI INTERNATIONAL CORP. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided October 4, 1972)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* and *Irving Levine* of counsel) for the plaintiff.

*Harlington Wood, Jr.*, Assistant Attorney General (*Susan C. Cassell*, trial attorney), for the defendant.

Before RICHARDSON and LANDIS, Judges, and ROSENSTEIN, Senior Judge

LANDIS, Judge: These protests, consolidated for trial, involve ceramic articles, wholly or in chief value of porcelain, subporcelain, and

stoneware, commercially known as "Berl Saddles", imported from Japan.

Customs classified the Berl saddles as industrial chemical ware, of ceramic ware. It assessed those wholly or in chief value of porcelain or subporcelain at 60 per centum ad valorem under TSUS [1] item 535.21. The Berl saddles, wholly or in chief value of stoneware, were assessed at 40 per centum ad valorem under TSUS item 535.24.

Plaintiff claims that the Berl saddles assessed at 60 per centum ad valorem are properly dutiable either at 14 per centum ad valorem under TSUS item 535.41 as machinery parts, of porcelain or subporcelain, or alternatively, at 45 per centum ad valorem under TSUS item 536.11 as ceramic articles of porcelain or subporcelain, not specially provided for. The Berl saddles assessed at 40 per centum ad valorem are claimed properly dutiable at 20 per centum ad valorem under TSUS item 536.15, as ceramic articles, not specially provided for, other than porcelain or subporcelain.[2]

The above tariff assessments are provided for in schedule 5, part 2 of TSUS, in relevant context as follows:

SCHEDULE 5. – NONMETALLIC MINERALS AND PRODUCTS
Part 2. – Ceramic Products

Subpart D. – Industrial Ceramics

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

Laboratory and industrial chemical ware, of ceramic ware:

| | | |
|---|---|---|
| 535.21 | Of porcelain or of subporcelain___ | 60% ad val. |
| 535.24 | Of stoneware_____ | 40% ad val. |
| * * * | Other _____ | * * * |

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

| | | |
|---|---|---|
| 535.41 | Machinery parts, of porcelain or of sub-porcelain _____ | 14% ad val. |

Subpart E. – Ceramic Articles Not Specially Provided For

Ceramic wares, and articles of such wares, not specially provided for:

| | | |
|---|---|---|
| 536.11 | Of porcelain or of subporcelain____ | 45% ad val. |
| 536.15 | Other _____ | 20% ad val. |

The customs classification and plaintiff's claims, it should be noted, give no reason to doubt that the imported Berl saddles are articles of ceramic ware. Any issue as to the existence of that fact need not, therefore, concern us on this record.

Articles which are industrial chemical ware, of ceramic ware, and articles that are machinery parts, of porcelain or of subporcelain, are specially provided for, and cannot be classified as articles of ceramic

[1] Tariff Schedules of the United States, 19 U.S.C.A. § 1202.
[2] A claim under TSUS item 523.91 was abandoned at the trial.

ware, not specially provided for, as plaintiff claims. Cf. *United States, etc.* v. *Simon Saw & Steel Company*, 51 CCPA 33, 40, C.A.D. 834 (1964). The classification of the imported Berl saddles as industrial chemical ware, of ceramic ware, is presumed to be correct. Plaintiff, in the context of its claims must, therefore, not only negative that presumption, but must affirmatively establish that Berl saddles, of porcelain or of subporcelain, are machinery parts, or that Berl saddles, of porcelain or of subporcelain, or of stoneware, are articles of ceramic ware, not specially provided for. *The De Haan Company* v. *United States*, 55 CCPA 76, C.A.D. 936 (1968); *Hayes-Sammons Chemical Co.* v. *United States*, 55 CCPA 69, C.A.D. 935 (1968). For reasons discussed herein we overrule the protests.

The record consists of the official papers; the testimony of five witnesses (two for plaintiff and three for defendant) and seven exhibits. Except for exhibit 1,[3] a representative sample of the Berl saddles, and exhibit A, a photostatic copy of a published article entitled "Chemical Stoneware", written by Mr. Fred M. Klein, one of defendant's witnesses, there is little need to advert to the various exhibits.[4]

Relative to the classification of the imported Berl saddles, the following facts are not in dispute. Berl saddles are used as "tower packing" in installations designed to transfer material from a gaseous mixture to a liquid solution by absorption, or from a liquid phase to a gas phase by desorption. The tower is, per se, a cylindrical shell made of any construction material. The Berl saddles are packed randomly in the shell with the bottom layer resting on a slotted or perforated plate in the shell. The gas flows vertically upward through the packing. A liquid distributor positioned above the packing distributes the liquid across the top layer of Berl saddles whence the liquid apparently trickles down through the packing "providing for contact between gas and liquid on the surface of the packing." The absorption process has many purposes. Those mentioned of record are purification of a gas stream in pollution control, and recovery in a liquid phase of the solute gas component in the gas stream, for further processing of a product.

An absorption tower installation consists of the tower, the packing, a blower to transport the gas through the packing; pumps for bringing the liquid to the top of the tower and recirculating it; instrumentation such as level controls, temperature recorders, pressure indicators; monitoring devices to determine the efficiency of the operation; flow meters to determine the rate of the liquid and gas flow, and valves and switches.

---

[3] Exhibit 1, configured in the shape of a saddle, measures one inch in size.

[4] Exhibit 2 is a list of published articles authored by Dr. Aaron J. Teller, introduced to support his qualifications to testify for plaintiff; exhibits 3, 4, B, and C are pictures as drawings of tower, column, and cylindrical installations.

There are other types of tower packing besides Berl saddles. The first uniform tower packing was the "Raschig ring". Prior to that time people used crushed coke, crushed glass, or any shape that would go into the shell. Raschig rings, Berl saddles, interlox saddles, power rings, and tellerette packing are all commercially sophisticated tower packings. Tower packing is an essential component, and performs a useful function, in an absorption tower installation.

The witnesses, all well qualified (some to a greater or lesser degree than others), sharply disagreed in their professional opinions of what Berl saddles, of ceramic ware, are. Dr. Aaron J. Teller, plaintiff's witness, testified that Berl saddles are not industrial chemical ware. He based his opinion on the fact that Berl saddles are used as packing, and in tower packing the composition or material of which the packing is made is not "necessarily" as significant to the function and efficiency of the packing as the "geometry" or shape of the packing. Industrial chemical ware, of ceramic ware, in Dr. Teller's opinion, is specifically concerned with the material of construction, namely, that it be corrosive resistant for use in the laboratory. Dr. Teller first described the transfer from a gaseous to a liquid phase as physical, rather than chemical, in nature, but later explained that the "mass transfer process is essentially a physical process which can be affected by chemical reaction." The Berl saddle, Dr. Teller stated, aids the diffusional mechanism and the diffusion mechanism is purely a physical phenomena. In all his years of experience, Dr. Teller said, he had never heard of tower packings or Berl saddles, whether produced of ceramic ware or of furan resin, polypropylene, stainless steel, nickel, or other materials, referred to as industrial chemical ware. Tower packings, he testified, are not bought and sold by the term "industrial chemical ware" but simply as tower or column packings.

On cross-examination, Dr. Teller testified that he was familiar with the use of tower packings in laboratory columns used in simple distillation experiments. He reiterated that the shape of the Berl saddle was its predominant feature and not the material of which made, but agreed that certain materials would be "unfunctional" as packing because they would be dissolved by erosive chemicals. Berl saddles, according to Dr. Teller, are made of porcelain ware, not necessarily for corrosive resistance, but because it is cheap, yet he agreed that the packing, for some of the purposes he testified to, would have to be chemically resistant. Generally, said Dr. Teller, tower packing is not made for a specific tower. He explained that when he testified, on direct examination, that the mass transfer operation was a physical and not a chemical reaction, he meant that "the diffusional component is a physical phenomenon" but the "total transfer process", the rate, can be affected by ancillary chemical reaction. He agreed that tower

packing, of ceramic ware, ordinarily, would be corrosively resistant to hydrochloric acid.

Defendant's three witnesses were all of the opinion that Berl saddles, of ceramic ware, are industrial chemical ware which they defined as ceramic material that is corrosively resistant. One of dedendant's witnesses, Mr. Klein, stated that his company, Maurice A. Knight Co., held a license from Dr. Berl to manufacture Berl saddles.

Dr. Teller's opinion testimony, upon which plaintiff so strongly relies, does not, in our opinion, overcome the presumption that Berl saddles, of ceramic ware, are generically industrial chemical ware, of ceramic ware. The fact that Berl saddles are bought and sold as tower or column packings does not necessarily withdraw them, for tariff purposes, from the generic class to which they presumptively belong. *Austin, Nichols & Co.* v. *United States*, 4 Ct. Cust. Appls. 261, T.D. 33483 (1913). It may be that Dr. Teller never did hear of Berl saddles, of ceramic ware, or any other material, referred to as chemical ware. The technical literature on ceramic chemical ware and on absorption packed towers, cited *infra*, however, preemptively discusses Berl saddles in the context of packed towers and ceramic chemical ware.

The briefs on both sides agree that standard dictionaries in general use do not sustain a common meaning for the tariff term "chemical ware". The tariff history of the term cited by both sides, on the other hand, sustains the opinion of Dr. Teller, and defendant's witnesses, that the term "chemical ware" is a generic term for ceramic articles that are corrosively resistant when "used to contain or convey corrosive liquids",[5] and which are "unaffected by most chemicals".[6] The term, therefore, generically identifies a class of articles without identifying each article that may be within the class. Where common nomenclature employed in various useful arts is not adequately reflected in dictionaries for general use, the court may go to other more precise sources of information as to the common meaning in various trades of the words common thereto. *United States* v. *The Spiegel Bros. Corp.*, 51 CCPA 69, 73, C.A.D. 839 (1964). It is not "the function of the court to 'define' technological terms in the tariff act but rather to construe and apply them on a case by case basis." *Firth Sterling, Inc.* v. *United States*, 48 CCPA 130, 136, C.A.D. 779 (1961). We conclude that the tariff classification of Berl saddles, of ceramic ware, must be determined in the context discussed in the precise sources on ceramic chemical ware. *Brown Boveri Corp., Gehrig Hoban & Co., Inc.* v. *United States*, 53 CCPA 19, 23, C.A.D. 870 (1966).

Contrary to Dr. Teller's opinion testimony, the text material available to us on ceramic chemical ware and absorption packed towers

---

[5] Summary of Tariff Information (1921), page 295; Summary of Tariff Information (1929), page 481.
[6] Summary of Tariff Information (1948), Volume 2, pages 178, 179.

confirms the opinion of defendant's witnesses that Berl saddles, of ceramic ware, used in tower packings, are generically included in the term "chemical ware",[7] and that "packing types" of metal "are not as generally resistant to all corrosive conditions as are the stoneware shapes."[8] Dr. Teller did not testify that the imported Berl saddles, of ceramic ware, are not resistant to corrosive conditions. His distinction between the physical diffusion process, and the chemical reaction that goes on in a packed tower, using Berl saddles, of ceramic ware, does not overcome the presumption that Berl saddles, of ceramic ware, are industrial ceramic chemical ware. Moreover, Dr. Teller's testimony is rebutted by the testimony of the government's three witnesses.

This brings us to plaintiff's contention that, even if the imported Berl saddles are chemical ware, the tariff provision for machinery parts, of porcelain or of subporcelain, is relatively more specific than the tariff provision for laboratory and industrial chemical ware, of ceramic ware, and that the TSUS general rule of interpretation on parts[9] is inapplicable to a superior heading classifying machinery parts, of porcelain or of subporcelain.

Plaintiff's reliance on rule 10(ij) in its argument on relative specificity (plaintiff's brief, page 39), namely, that a product solely or chiefly used as part of another article is more specific than the provision for laboratory and industrial chemical ware, we note, is a contradiction of its contention that rule 10(ij) is inapplicable to a superior heading classifying machinery parts, of porcelain or of subporcelain. For the reason that plaintiff cannot have rule 10(ij) both ways, we deem the contention is inadequate. As defendant asserts, a superior heading for "machinery parts" and a superior heading for the article and parts thereof (i.e. such as machinery and parts thereof) is a distinction without a difference. General Interpretative Rule 10(ij) is an unqualified controlling rule with respect to the classification of parts. We must follow the rule where it can be fairly and reasonably applied.

The Tariff Classification Study, Seventh Supplemental Report (at page 99), explained the intent behind rule 10(ij) as follows:

> General headnote 10(ij)—Parts. A provision for "parts" does not prevail over a specific provision for such part. Thus, a provision for "parts" is more specific than a provision for "articles, not specially provided for", but is not more specific than provisions such as the following for: "springs" (item 652.85), "illuminating articles" (item 653.30–.40), "pumps" (items 660.90–661.15), etc.

[7] Encyclopedia of Chemical Technology (1949), Volume 3, Ceramics (Chemical Ware), pages 575, 582, Interscience Publishers, Inc., New York, N.Y.

[8] Encyclopedia of Chemical Technology (1949), Volume 1, Absorption (Packed towers), pages 16, 17, Interscience Publishers, Inc., New York, N.Y.

[9] TSUS General Interpretative Rule 10(ij) provides as follows:

(ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

Viewed in this context, we are inclined to agree with defendant that the provision for laboratory and industrial chemical ware, of ceramic ware, is as much a specific provision for parts that are laboratory and industrial chemical ware as is the provision for "illuminating articles" a specific provision for parts that are illuminating articles.

The term "chemical ware", as we shall discuss, *infra*, is specifically applicable to articles of porcelain or of subporcelain processed in a particular way, more with regard to their function as chemical ware, than their function as an article. The term "laboratory and industrial chemical ware", of ceramic ware, is, in our opinion, sufficiently specific to cover machinery parts, of porcelain or of subporcelain, that are laboratory and industrial chemical ware, of ceramic ware. Cf. *West Coast Glass Distributors* v. *United States*, 62 Cust. Ct. 444, C.D. 3797, 298 F. Supp. 1188 (1969).

While we believe that rule 10(ij) is adequate to dispose of the case, we nevertheless discuss plaintiff's argument (with which we do not agree) that the provision for machinery parts, of porcelain or of subporcelain, is relatively more specific than the provision for laboratory and industrial chemical ware, of ceramic ware.

As plaintiff contends (brief, page 34), an absorption or pack tower "with its complimentary equipment (support plate, distributor, blowers, pumps, level controls, temperature and pressure recorders, monitoring devices, flow meters, valves and switches * * *)", may well be "machinery" in the comprehensive sense of the term.[10] Assuming, without deciding, that Berl saddles are "machinery parts" (a classification which, in general, is intended to apply "to articles which can be recognized as being parts of machines but not as parts of any particular machine"),[11] in the same sense that forged steel balls used in ore-grinding mills for the purpose of pulverizing were held properly dutiable as parts of machines under the 1930 Act,[12] *Steel, Inc.* v. *United States*, 28 CCPA 77, C.A.D. 128 (1940), we are of the opinion that the tariff provision for laboratory and industrial chemical ware, of ceramic ware, is relatively more specific than the tariff provision for "machinery parts, of porcelain or of subporcelain".[13]

---

[10] See, TSUS item 661.95, schedule 6, part 4, and part 4 headnote 1(v), and comparable Brussels Nomenclature, heading 84.18 with explanatory notes on gas scrubbers or absorption towers and parts thereof (Explanatory Notes to the Brussels Nomenclature, Volume III, pages 801–805).

[11] Tariff Classification Study, schedule 6 (item 680.60), at page 276.

[12] TSUS, schedule 6, part 4, "Subpart J — Parts of Machines", provides for "forged steel grinding balls" under item 680.40.

[13] TSUS General Interpretative Rule 10(c) provides that:

(c) an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it; but, in applying this rule of interpretation, the following considerations shall govern:
(i) a superior heading cannot be enlarged by inferior headings indented under it but can be limited thereby;
(ii) comparisons are to be made only between provisions of coordinate or equal status, i.e., between the primary or main superior headings of the schedules or between coordinate inferior headings which are subordinate to the same superior heading;

The term "machinery parts" in TSUS item 535.41, which was originally drafted to cover only "textile" machinery parts, of porcelain or of subporcelain, previously classified under paragraph 372 of the 1930 Act, was broadened to include other parts classified under paragraph 214 of the 1930 Act.[14] *American Feldmuehle Corp. et al.* v. *United States*, 64 Cust. Ct. 462, 468, C.D. 4021. (1970).

Articles, of porcelain or of subporcelain, fall into two categories, those of a category known as chemical ware, and those which while of porcelain or of subporcelain, are not chemical ware.[15] The end uses of chemical ware, which are as varied as the requirements of the chemical industry, include standard chemical equipment such as:

> * * * piping, vessels, towers, filters, valves, mechanical equipment such as pumps and exhausters, *tower packing* [emphasis added], laboratory sinks and fume ducts, and porous diaphragms for electrolysis uses. All of these items can be manufactured in both chemical stoneware and porcelain although the tendency has been, since chemical porcelain is relatively new, to limit the size of chemical porcelain equipment. With the exception of one company, chemical porcelain production is mainly limited to piping up to 8 in. in diameter, valves, and tower packing. * * * [Encyclopedia of Chemical Technology, Volume 3, page 581.]

---

[14] Under the 1930 Act, "Berl saddles, porcelain, used principally as tower packing in the chemical and allied industries, * * * [were] classifiable as articles in chief value of earthy or mineral substances, not specially provided for, not decorated, under paragraph 214 * * *." [95 Treas. Dec. 293, 294, T.D. 55147(5) (1960).]

[15] The Encyclopedia of Chemical Technology (n. 7, *supra*) implicitly makes this distinction in the technical discussion of ceramic chemical ware as follows:

CHEMICAL WARE

Chemical ceramic ware, as used in the process industries for the handling of corrosive chemicals, comprises chemical stoneware, chemical porcelain, and porous ware. See also *Materials of construction.*

Chemical stoneware is a generic term for a ceramic body that is carefully compounded, processed, and fabricated to produce a shape that has low absorption, high density, high corrosion resistance and physical strength, and comparatively high resistance to thermal shock, thus enabling it to be used for chemical equipment.

Chemical porcelain differs from chemical stoneware in that it has zero porosity and zero or very low iron content, and is pure white in color. The plastic raw materials for porcelain contain considerable kaolin, whereas a preponderance of the ball clays is used for stoneware. Processing differences account for other dissimilarities between the two bodies.

Because of higher raw material costs, greater care in body preparation, and higher firing temperatures, chemical porcelain equipment is more expensive than chemical stoneware equipment. Although it is difficult to give exact figures, it can be said that, generally, chemical porcelain ware costs approximately one and one-half times as much as chemical stoneware for the same equipment unit.

\* \* \* \* \* \* \*

Manufacture

The raw materials and methods of production of the three types of chemical ware are similar to those used for ceramic ware in general (see, "Whiteware," p. 545). However, in order to give the finished apparatus the desired characteristics of high corrosion resistance and physical strength, improved thermal-shock resistance, and other properties that place it in the category of chemical ware, the raw materials must be carefully selected and processed. The requirements for chemical ware, which differentiate it from other ceramics, are: extreme plasticity and maximum mechanical strength to allow forming into complex shapes; freedom from soluble salts and ready elimination of organic impurities by oxidation to ensure corrosion resistance; uniform shrinkage during drying and firing; thorough vitrification at maximum kiln temperature plus a considerable range of temperature between vitrification and fusing points to prevent firing distortion, in order to permit fabrication to close dimensional tolerances. Clays having these properties are rarely found in nature and it is usually necessary to compound several different clays to formulate any one body. [Pages 575, 576.]

The above uses of chemical ware indicate that while ceramic chemical ware includes tower packing of porcelain or of subporcelain that is chemical ware (plaintiff claims ceramic tower packing is machinery parts), not all machinery parts of porcelain or of subporcelain (i.e. textile machinery parts) are necessarily chemical ware.

Plaintiff to the contrary, we are of the opinion that the customs classification as laboratory and industrial chemical ware, of ceramic ware, under TSUS items 535.21 and 535.24 describes Berl saddles of porcelain or of subporcelain that are chemical ware "with the greatest degree of accuracy and certainty", *United States* v. *Ampex Corp. et al.*, 59 CCPA 134, 138, C.A.D. 1054 (1972), because it is more difficult to satisfy than plaintiff's claimed classification as machinery parts, of porcelain or of subporcelain. *United States, etc.* v. *Simon Saw & Steel Company*, 51 CCPA 33, 40, C.A.D. 834 (1964). Laboratory and industrial ceramic ware, of porcelain or of subporcelain, to be sure, covers articles as varied as the requirements of the chemical industry but, as plaintiff admits, it "is restrictive" in the sense that the article must be within the common meaning of the term "chemical ware" (plaintiff's brief, page 36). The raw materials that place an article of ceramic ware in the category of chemical ware must be carefully selected and processed. The provision for machinery parts, of porcelain or of subporcelain, is equally if not more comprehensive than the provision for laboratory and industrial chemical ware. However, the provision for machinery parts is not limited to parts of any particular machine, and includes all machinery parts, of porcelain or of subporcelain, whether chemical ware or not. Cf. *Vandegrift & Co.* v. *United States*, 15 Ct. Cust. Appls. 165, 170, T.D. 42221 (1927).

Since the imported Berl saddles are articles, of porcelain or of subporcelain, of a kind presumptively specially processed as to place them in the category of chemical ware, they are more specifically provided for as laboratory and industrial chemical ware than as machinery parts, of porcelain or of subporcelain.[16]

In view of our holding that Berl saddles, of porcelain or of subporcelain, or of stoneware, are specially provided for as classified, they

---

[16] The United States Tariff Commission (which drafted and submitted the TSUS schedules, as directed by the Congress, see Tariff Classification Study, Submitting Report) in the Summaries of Trade and Tariff Information (1971), schedule 5, volume 3, comments on the provisions of TSUS for laboratory and industrial chemical ware and machinery parts, of porcelain and subporcelain, *Tanross Supply Co., Inc.* v. *United States*, 58 CCPA 26, 31, C.A.D. 1000 (1970), footnote (8) ; *American Bristle & Hair Drawing Co. et al.* v. *United States*, 59 CCPA 104, C.A.D. 1048 (1972), as follows :

LABORATORY AND INDUSTRIAL CHEMICAL WARE

Description and uses

The laboratory and industrial chemical ware here considered includes articles, apparatus, and equipment made from porcelain, subporcelain, stoneware, and other ceramic bodies. Chemical porcelain is used for laboratory apparatus, the more important pieces of which are mortars and pestles, filtration funnels, crucibles, and evaporating dishes. Chemical stoneware includes such chemical processing equipment

are not classifiable as ceramic wares, not specially provided for, as plaintiff has alternatively claimed.

The protests are overruled. Judgment will be entered accordingly.

as laboratory sinks, pipe, valves, vacuum filters, and *absorption towers and packing rings.* [Emphasis added.] Filters and porous membranes are made from earthenware and other porous ceramics. [Page 147.]

PORCELAIN AND SUBPORCELAIN MACHINERY PARTS

Description and uses

Machinery parts made from porcelain and subporcelain usually have a high degree of chemical inertness and resistance to abrasion and mechanical impact. * * *

The principal machinery parts covered by this summary include grinding media and mill lining blocks used by the chemical, ceramic, plastic, cement, and paint-pigment industries to control contamination; pump parts, such as valves and plungers, used by the petroleum and chemical industries to handle corrosive materials; extrusion dies used to shape and form metals; textile thread guides used in the spinning and weaving of natural and man-made fibers; sprayer tips used in agriculture equipment to apply fertilizers and insecticides; porcelain tool tips used in various machines, such as lathes and boring mills, for cutting metal; and forms used in making rubber gloves and balloons. [Page 161.]